792 P.2d 749

**HARTFORD ACCIDENT & INDEMNITY COMPANY, Plaintiff/Appellant,**

v.

**AETNA CASUALTY & SURETY COMPANY, Defendant/Appellee.**

No. CV–89–0101–T/AP.

Supreme Court of Arizona, In Banc.

May 29, 1990.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by John H. Westover, Phoenix, and Peter Akmajian, Tucson, Vermeire, Turley & Ryan, P.C. by Christopher J. Bork, Phoenix, for plaintiff/appellant.

Black, Robertshaw, Copple & Pozgay, P.C. by Richard A. Black, and Rake Copple Downey & Black P.C. by Philip C. Thorpe, Phoenix, for defendant/appellee.

CAMERON, Justice

## I.  JURISDICTION

Hartford Accident & Indemnity Company petitioned this court for transfer from the court of appeals pursuant to Rule 19(a)(1), 17B A.R.S. Civil Appellate Procedure

Rules, claiming that *Universal Underwriters Ins. Co. v. Dairyland Mut. Ins. Co.,* 102 Ariz. 518, 433 P.2d 966 (1967), a decision of this court, should be overruled. We granted the petition due to confusion in this area of the law, and because an issue of statewide interest is presented. We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## II.  ISSUE

We decide only one question on appeal: May an excess insurance carrier, under the doctrine of equitable subrogation, assert a claim against a primary insurance carrier for bad faith failure to settle within primary policy limits?

## III.  FACTS

Jamie Hart was insured under an automobile liability policy issued by Aetna Casualty & Surety Company (Aetna) with a policy limit of $25,000. Hartford Accident & Indemnity Company (Hartford) provided Hart with excess coverage through a policy issued to Hart's employer, Wendy's International, Inc. The Hartford policy covered Wendy's employees driving their own automobiles in the course of their employment.

In May 1985, Hart was involved in an automobile accident with Bradley Harris while Hart was on an errand in the scope and course of her employment. The accident was reported to Aetna, the primary insurer, and a claims file was opened with a personal injury reserve of $2,500 set on the case. After an investigation, Aetna claims representative Erin Lewers determined that Hart failed to yield the right-of-way to Harris and that Aetna therefore should provide coverage.

Prior to trial Harris made several settlement offers. The first of these occurred in November 1985, and was for $10,491.75. Aetna rejected this settlement offer and offered $1,200, then $1,500, both of which were rejected by Harris. Sometime prior to June 1986, Harris offered to settle for $2,500, then for $2,100. However, both offers were withdrawn before being accepted.

In February 1986, Aetna informed a Wendy's staff attorney that the claim appeared to be worth less than the primary policy limits and that Aetna would let the attorney know if it appeared excess exposure would result. No further communication concerning the claim occurred between Aetna, Wendy's and Hartford until judgment was entered in *Harris v. Hart.* (Brief for Appellant at 13.)

In June 1986, the attorney Aetna hired to defend Hart advised Aetna that, in his opinion, the verdict potential in the case was between $5,000 and $10,000. On June 18, Aetna's claim representative valued Harris's claim at $2,000. On 31 July 1986, Aetna's claim representative made a note to increase the reserve on the file to $6,000.

In August 1986, Aetna offered Harris $3,500 to settle the case. Harris counteroffered for $10,000. On 30 September 1986, Aetna raised the offer to $4,200 after an orthopedic surgeon retained by Aetna to evaluate Harris's condition reported that Harris had a 5% permanent impairment due to injury of the left lateral femoral cutaneous nerve.

A second evaluation of Harris indicated he had a current orthopedic problem with associated pain. Hart's attorney then reported to Aetna that, in his opinion, the verdict potential was between $10,000 and $20,000.

On 13 November 1986, a final review of the file was completed before trial. Aetna then valued the claim at $6,000. This value could not be changed without approval of a claims manager in Denver.

Prior to trial, the trial court estimated that a fair settlement value for the case was $15,000 and asked the parties if they would settle for that amount. Harris was willing to settle, but Aetna would not approve the higher amount.

The jury awarded Harris $140,000 in damages to cover any future surgery expenses, and to assure him sufficient funds if he ever lost his job because of his injuries. Harris agreed to accept $100,000 in satisfaction of the judgment while the case was on appeal. Hartford paid $37,500 and

Aetna paid $62,500, with an agreement that their contributions would not prejudice their rights in this matter.

On 5 May 1987, Hartford filed this action against Aetna, alleging that Aetna acted in bad faith by failing to accept settlement offers within Aetna policy limits. Pursuant to A.R.S. § 12–1831 Hartford requested a declaratory judgment that, under the theory of equitable subrogation, Aetna was obligated to pay the entire amount of the excess judgment. Aetna counterclaimed, seeking a declaration that Hartford was responsible for all but the first $25,000 of the judgment.

The trial court granted summary judgment in favor of Aetna. Implicit in the court's ruling was the finding that *Universal* barred Hartford's claim for equitable subrogation. Hartford appealed to the court of appeals and then sought a transfer to this court.

## IV. DISCUSSION

We view the facts in a light most favorable to Hartford, the party against whom summary judgment was granted. *United Services Auto. Ass'n v. Morris*, 154 Ariz. 113, 114, 741 P.2d 246, 247 (1987); *Farmers Ins. Co. v. Vagnozzi*, 138 Ariz. 443, 448, 675 P.2d 703, 708 (1983). We assume that, if a duty of good faith is owed from the primary carrier to the excess carrier, Hartford established a *prima facie* case that Aetna breached its implied duty of good faith by refusing offers of settlement with-

in policy limits. *See Brisco v. Meritplan Ins. Co.*, 132 Ariz. 72, 643 P.2d 1042 (App. 1982).

### 1. *Equitable Subrogation*

█ It is settled law in Arizona, based on a covenant of good faith and fair dealing, that an insurance company owes its insured a duty of good faith in deciding whether to accept or reject settlement offers. *Arizona Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987); *City of Glendale v. Farmers Ins. Exchange*, 126 Ariz. 118, 120, 613 P.2d 278, 280 (1980); *Farmers Ins. Exchange v. Henderson*, 82 Ariz. 335, 338–39, 313 P.2d 404, 406 (1957). In the third party context,[1] this duty of good faith requires an insurer to give equal consideration to the protection of the insured's as well as its own interests. *Henderson*, 82 Ariz. at 338, 313 P.2d at 406. If an insurance company fails to settle, and does so in bad faith, it is liable to the insured for the full amount of the judgment. *Id.* at 341, 313 P.2d at 408. This rule is recognized, in part, because the insurer exercises control over the litigation.

A number of jurisdictions have expanded the duty of good faith by recognizing a duty to an excess insurance company by the primary insurance company. In fact, many states confronted with the issue have allowed an excess insurer to pursue a claim against a primary insurer for breach of good faith.[2] Most of these courts have

---

1. Third party coverage comes into play when an insurance carrier contracts to compensate its insured for liability to third parties. First party coverage involves liability policies which directly benefit the insured. For a discussion of the differences between third party and first party bad faith claims, see *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 164 Ariz. 256, 792 P.2d 719 (1990).

2. California: *Peter v. Travelers Ins. Co.*, 375 F.Supp. 1347 (C.D.Cal.1974); *Northwestern Mut. Ins. Co. v. Farmers Ins. Group*, 76 Cal.App.3d 1031, 143 Cal.Rptr. 415 (1978); Florida: *Ranger Ins. Co. v. Travelers Indem. Co.*, 389 So.2d 272 (Fla.Dist.Ct.App.1980); Indiana: *Certain Underwriters of Lloyd's v. Gen. Acc. Ins. Co.*, 699 F.Supp. 732 (S.D.Ind.1988); Maryland: *Fireman's Fund Ins. Co. v. Continental Ins. Co.*, 308 Md. 315, 519 A.2d 202 (1987); Michigan: *Com-*

*mercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 393 N.W.2d 479 (1986); Minnesota: *Continental Cas. Co. v. Reserve Ins. Co.*, 307 Minn. 5, 238 N.W.2d 862 (1976); New Jersey: *Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford*, 72 N.J. 63, 367 A.2d 864 (1976); New York: *Home Ins. Co. v. Royal Indem. Co.*, 68 Misc.2d 737, 327 N.Y.S.2d 745 (Sup.Ct.1972); Ohio: *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 62 Ohio St.2d 221, 404 N.E.2d 759 (1980); Oklahoma: *American Fidelity & Cas. Co. v. All American Bus Lines*, 179 F.2d 7 (10th Cir.1949); Oregon: *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506 (9th Cir.1984); Pennsylvania: *United States Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306 (3d Cir.1985); West Virginia: *Vencill v. Continental Cas. Co.*, 433 F.Supp. 1371 (S.D.W. Va.1977); *see also* cases cited in Annotation, *Excess Carrier's Right to Maintain Action Against Primary Liability Insurer for Wrongful*

adopted the theory of equitable subrogation, whereby the excess insurer steps into the shoes of the insured. The theory behind equitable subrogation is that, by purchasing excess coverage, an insured in effect substitutes the excess insurer for himself. A minority of courts have found that the primary insurer owes a direct duty of good faith to the excess insurer.[3]

One reason courts have recognized a cause of action for equitable subrogation is to encourage fair and reasonable settlements of lawsuits. In *Northwestern Mutual Ins. Co. v. Farmers Ins. Group*, a California Appeals Court stated:

> [I]n addition to protecting the insured, the rule imposing liability on an insurer for failure to effect reasonable settlement within its policy limits serves the important public policy of encouraging settlement of legal controversies. Thus, enforcement of the primary insurer's duty to settle in good faith by equitably subrogating the excess insurer to the rights of the insured is fully warranted by public policy notwithstanding imposition of the duty may have been primarily for the benefit of the insured in the first instance.

76 Cal.App.3d 1031, 1050–51, 143 Cal.Rptr. 415, 427 (1978); *see also Ranger Ins. Co. v. Travelers Indem. Co.*, 389 So.2d 272, 275 (Fla.Dist.Ct.App.1980). A primary insurer has less incentive to settle within policy limits if an excess insurer is available to cover any amount over the primary insurer's liability limits. We believe this disincentive to settle will lead to increased insurance and litigation costs. As stated by the Michigan Supreme Court:

> [A]llowing the excess insurer to enforce the primary insurer's duty to settle in good faith serves the public and judicial interests in fair and reasonable settlement of lawsuits by discouraging primary carriers from "gambling" with the excess carrier's money when potential judgments approach the primary insur-

er's policy limits. Finally, the public interest in avoiding unnecessarily high insurance premiums is served by recognizing such a cause of action because, where the excess insurer is required to cover both primary and excess liability as a result of the primary insurer's breach of the duty to settle in good faith, policy rating structures are distorted, rendered uncertain, and made more expensive.

*Commercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 119, 393 N.W.2d 479, 483 (1986) (citations omitted); *see also Peter v. Travelers Ins. Co.*, 375 F.Supp. 1347, 1350–51 (C.D.Cal.1974) ("If the primary carrier is relieved of its duty to accept reasonable offers by the existence of excess insurance, it would put an additional financial liability on the excess carrier which would be reflected in increased premiums").

Another consideration in recognizing a cause of action for equitable subrogation is to prevent an unfair distribution of losses among primary and excess insurers. This problem may arise when the excess insurer settles with the claimant and the primary insurer objects, offering nothing toward settlement. As the Minnesota Supreme Court noted:

> If the excess insurer elects to settle in spite of the primary insurer's bad-faith objections, ... the excess insurer risks losing the policy-limit contributions of the primary insurer and being forced to pay the entire settlement itself, even though the settlement may have been in the overall best interest of the insured. In such a case, the incentives are against settlement. If the excess insurer must pay the entire settlement, he may save at least the amount of the primary insurer's policy limits by going to trial, since the latter would then have to pay the amount of its limits toward the judgment. A primary insurer should not be permitted to obstruct in bad faith the important settlement process.

---

*Failure to Settle Claim Against Insured,* 10 A.L.R. 4th 879 (1981).

**3.** *See, e.g., Hartford Acc. & Indem. Co. v. Michigan Mut. Ins. Co.,* 61 N.Y.2d 569, 574, 463

N.E.2d 608, 610, 475 N.Y.S.2d 267, 269 (1984); *Estate of Penn v. Amalgamated General Agencies,* 148 N.J.Super. 419, 424, 372 A.2d 1124, 1127 (1977).

Second, a contrary result in this case would permit an unfair distribution of losses among insurers. The insured has paid for two distinct types of coverage, undoubtedly at different rates because they involve different amounts and kinds of risks. Primary coverage is designed to cover liability from zero to certain policy limits ... excess coverage is designed to cover liability only after those initial limits are exhausted. When a primary insurer refuses in bad faith to settle, it forces the excess insurer making a reasonable settlement to cover both primary and excess liability. Thus, the purposes of the different kinds of coverage and their rating structures are thwarted as the excess insurer bears the full loss and fulfills the primary insurer's duty to the insured as well as its own. Whether on insurance-economics principles or general equitable principles, a party should not be made to bear a loss that rightfully belongs to another party.

*Continental Casualty Co. v. Reserve Ins. Co.*, 307 Minn. 5, 9–10, 238 N.W.2d 862, 865 (1976).

■ An excess insurer should not have to pay a judgment if the primary insurer caused the excess judgment by a bad faith failure to settle within primary limits. We hold, therefore, that an excess carrier is subrogated to the rights of the insured and has a cause of action against the primary insurer for bad faith failure to settle within policy limits.[4] This right is derivative of the contract between the insured and primary carrier. *See Northwestern Mut. Ins. Co. v. Farmers Ins. Group*, 76 Cal.App.3d at 1050, 143 Cal.Rptr. at 426; *Liberty Mut. Ins. Co. v. Thunderbird Bank*, 113 Ariz. 375, 377, 555 P.2d 333, 335 (1976); *D.W. Jaquays & Co. v. First Security Bank*, 101 Ariz. 301, 304, 419 P.2d 85, 88 (1966). As subrogee, the excess insurer's rights are no greater than the insured's. *See Employers M.L.I. Co. of Wis. v. Robert E. McKee G.C., Inc.*, 16 Ariz. App. 77, 80, 491 P.2d 27, 30 (1971).

## 2. *Universal Underwriters Ins. Co. v. Dairyland Mut. Ins. Co.* 102 Ariz. 518, 433 P.2d 966 (1967)

Aetna contends that although this court in *Universal* did not specifically use the words "equitable subrogation," we described the basis of the doctrine and rejected it. We agree with this contention. In *Universal*, an excess insurance company (Universal Underwriters) sued a primary insurance company (Dairyland) to recover a $30,000 judgment the excess insurer paid after defending the insured. The insured automobile owner had a policy with Dairyland. The owner turned over her automobile to a garage attendant, an employee of Fletcher Jones Phoenix, who then had an accident with a third party. Fletcher Jones Phoenix was insured with Universal Underwriters. Universal argued that Dairyland was guilty of bad faith toward its insured (and to Universal through the insured) when it failed to defend and pay the judgment. Based on this alleged bad faith, Universal asserted that Dairyland should be liable for the entire $30,000 judgment.

The Arizona Court of Appeals in *Universal* found it unnecessary to address the issue of equitable subrogation. Instead, the court considered primary and secondary liability between the insurers, and concluded that primary liability derives from the active negligence of the named insured:

In the instant case both parties are insured and we have a question not of coverage or non-coverage but rather a question of primary and secondary liability, and it is the opinion of this Court that as to the two insurance carriers Universal had primary liability arising out of the accident and Dairyland Mutual Insurance Company had secondary liability. The reason is obvious in that the active negligence, the negligence which caused the accident, was occasioned by Universal's insured while Dairyland's insured can be guilty at most of only passive negligence in turning the automobile over to Eugene Jones for delivery to the garage for repairs.

\*　　\*　　\*　　\*　　\*　　\*

---

**4.** *See Clearwater* for a discussion of the elements of a bad faith claim.

The liability of the two insurance companies is derivative and the negligence of Universal's insured's being the active negligence, Universal is primarily liable. Since Dairyland's insured, Justine Meyers, was at most passively negligent, her (and Dairyland's) liability would be secondary.

Dairyland further contends that the assignment of Fletcher–Jones' interest to Universal for suit was either invalid or passed no right upon which Universal could base a suit against Dairyland. Having determined that Universal was primarily liable and Dairyland secondarily liable, we need not answer this question.

*Universal Underwriters Ins. Co. v. Dairyland Mut. Ins. Co.,* 5 Ariz. App. 174, 176–77, 424 P.2d 465, 467–68 (1967).

This court not only reversed and vacated the opinion of the court of appeals, but appeared to reject the doctrine of equitable subrogation, stating:

> Dairyland's policy limits are $10,000 for each individual injured and $20,000 for each accident. Universal argues that when Dairyland failed to defend and pay the judgment it was guilty of bad faith toward its insured, ... that under the circumstances Dairyland should be liable for the entire $30,000 which Universal paid to compromise and satisfy the judgment. We do not think so. Without doubt Dairyland owed good faith to its insured, which may or may not have been here exercised, a question we find unnecessary to answer. There is no privy [sic] of contract between these two insurance companies nor is there any principle of law of which we are aware that would give Universal such a windfall because of Dairyland's mistreatment of its assured.

*Universal,* 102 Ariz. at 520, 433 P.2d at 968. We went on to state that contribution was the appropriate remedy for an excess insurer against a primary insurer under the circumstances of the case:

> The principle applicable is that, where two companies insure the same risk and one is compelled to pay the loss, it is entitled to contribution from the other.

8 Appleman, Insurance Law and Practice 388, § 4913.

*Id.*

The Ninth Circuit referred to *Universal* in *Rocky Mountain Fire & Cas. Co. v. Dairyland Ins. Co.,* 452 F.2d 603 (9th Cir. 1971), and read *Universal* as prohibiting a cause of action for equitable subrogation. The court recognized, however, that it was following the dicta of *Universal* in refusing to recognize a good faith duty on behalf of an excess insurer:

> Rocky Mountain then commenced this action against Dairyland, seeking damages on the theories that (1) Dairyland owed a duty of good faith to the excess insurer and breached that duty by refusing to offer to pay its policy limits in settlement, and (2) Rocky Mountain, as subrogee of Tillery's rights, can recover for Dairyland's alleged breach of its duty to Tillery to negotiate in good faith.

> The opinion of the Arizona Supreme Court in *Universal Underwriters Insurance Co. v. Dairyland Mutual Insurance Co.,* 102 Ariz. 518, 433 P.2d 966 (1968), fairly read, rejects both contentions. A federal court exercising diversity jurisdiction is bound to follow the considered dicta as well as the holdings of state court decisions. *United States Fidelity & Guaranty Co. v. Anderson Construction Co.,* 260 F.2d 172, 176 (9th Cir.1958).

452 F.2d at 603–04. For a discussion of the limits of the *Universal* decision *see* Ingram, *Triangular Reciprocity in the Duty to Settle Insurance Claims,* 13 Pac. L.J. 859, 872–73 (1982) (the dictum in *Universal* is all that stands against the recognition of a good faith duty of a primary insurer to an excess insurer).

We are not bound by the Ninth Circuit decision in *Rocky Mountain* and its interpretation of Arizona law. *See Mason Dry Goods Co. v. Ackel,* 30 Ariz. 7, 13, 243 P. 606, 608 (1926). Although some courts have cited *Universal* and *Rocky Mountain* as rejecting equitable subrogation, other courts have found that neither case turned on that issue. *See, e.g., Northwestern Mut. v. Farmers,* 143 Cal.Rptr. at 424, 76

Cal.App.3d at 1046 ("The court in *Universal* gave no consideration to the doctrine of equitable subrogation and did not even mention the cases allowing recovery"). We believe this court impliedly rejected the doctrine of equitable subrogation in *Universal* when we stated:

> [N]or is there any principle of law of which we are aware that would give Universal such a windfall because of Dairyland's mistreatment of its assured.

*Universal,* 102 Ariz. at 520, 433 P.2d at 968. Because of our holding today, *Universal* is overruled to the extent it rejects equitable subrogation.

### 3. *Retroactive Application*

■ Aetna asks this court to limit our opinion in this case to prospective application. Unless the court specifies otherwise, Arizona appellate opinions in civil cases are given both prospective and retroactive effect. *Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 790 P.2d 242 (1990); *Law v. Superior Court,* 157 Ariz. 147, 160, 755 P.2d 1135, 1148 (1988). Whether a decision will be limited to prospective application, however, is a policy question within our discretion. *See Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 505, 733 P.2d 1073, 1088, *cert. denied,* 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987). The rule favoring retroactive application may be overcome and a decision applied prospectively if certain conditions, set out in an earlier opinion, are met:

> (1) The opinion establishes a new legal principle by either overruling clear and reliable precedent or by deciding an issue whose resolution was not foreshadowed;
>
> (2) Retroactive application of the opinion would adversely affect the purpose behind the new rule;
>
> (3) Retroactive application would produce substantial inequitable results.

*Chevron Chemical Co. v. Superior Court,* 131 Ariz. 431, 436, 641 P.2d 1275, 1280 (1982) (citing *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)). These factors are termed the reliance, purpose, and inequity factors. In making our determination, we balance these factors to decide whether the presumption favoring retroactive application is overcome. In this case, the balance is neutral regarding retroactive application. Thus, the presumption is not overcome and the opinion will apply retroactively.

■ The balance on the reliance factor in this case is neutral. This opinion is not establishing a new legal principle whose resolution was not clearly foreshadowed. Although some courts have interpreted *Universal Underwriters* as rejecting equitable subrogation, other courts have noted that the opinion did not directly address the issue. *See* cases cited in Annotation, *Excess Carrier's Right to Maintain Action Against Primary Liability Insurer for Wrongful Failure to Settle Claim Against Insured,* 10 A.L.R. 4th 879 (1981). Because courts have varied on their interpretation of *Universal,* the parties should have realized that it did not present "clear and reliable precedent."

The balance on the purpose factor is also neutral. The purpose of recognizing a cause of action for equitable subrogation is to encourage primary insurance carriers to deal in good faith with excess insurance carriers. Retroactive application of the opinion will neither impair nor further this purpose.

The balance on the inequity factor is neutral as well. This factor is closely related to the reliance factor and "focuses on the injustice or hardship that would result from retroactive application of the new rule." *Fain,* 163 Ariz. at 597, 790 P.2d at 252. Although retroactive application of this opinion may result in excess carriers bringing lawsuits against primary carriers for past abuses, equitable subrogation does not alter the bases of a primary carrier's liability. *See generally Henderson,* 82 Ariz. 335, 313 P.2d 404. This opinion merely adds another party plaintiff to an already existing cause of action and therefore does not produce substantial inequitable results.

Giving consideration to the above analysis, we conclude that the balance on the factors, in combination with the presumption favoring retroactive application, sup-

ports application of this opinion both prospectively and retroactively.

## V. DISPOSITION

When a primary insurance carrier acts in bad faith in refusing to settle, an excess insurance carrier should not have to pay for the primary carrier's unwillingness to take responsibility. Accordingly, we hold that, under the theory of equitable subrogation, an excess carrier has the right to sue a primary carrier for bad faith failure to settle within policy limits.

Reversed and remanded to determine whether the primary carrier exercised bad faith in refusing to settle within policy limits.

GORDON, C.J., FELDMAN, V.C.J., and MOELLER, J., concur.

CORCORAN, Justice, specially concurring:

I concur with the majority. However, I do not believe the result can be justified on the basis that it will "encourage fair and reasonable settlements of lawsuits." Although the public policy to encourage settlements generally results in reduced litigation, our holding today does not further the goal of judicial economy. Rather, I believe it will cause bad faith equitable subrogation litigation to develop into a new art form.

The sole issue to be resolved in the underlying case was the responsibility for an automobile accident. In this bad faith equitable subrogation claim, every decision made or not made by Aetna in defending the underlying accident claim will be minutely scrutinized and picked apart during prolonged discovery and trial by attorneys for both insurance companies and be submitted to a jury for verdict. The time required in discovery and in trial will, of necessity, far exceed that spent on the underlying accident claim.

I see no judicial economy. I do not foresee that a primary insurer will act any differently because an excess insurer has a right of equitable subrogation than if it did not.

I do foresee that jurors asked to decide these issues between battling insurance companies will be selected, not because of their knowledge or experience in resolving issues regarding automobile accidents, bad faith conduct by insurance companies, etc., but that they will be "selected" (or be the result of the selection process) because of their lack of knowledge and experience.

This area of dispute is peculiarly factual in nature and is most suitable for mediation, arbitration, or other methods of alternative dispute resolution between contending insurance companies. This is an area of law where a trier of fact familiar with applicable law and the businesses of primary insurers and excess insurers could resolve the dispute in a fraction of the time and expense involved in exhaustive discovery and trial to a jury. Lord Bramwell, over a century ago, expressed his frustration at being presented with a commercial dispute as to whether a provision in an agreement was "just and reasonable":

> For here is a contract made by a fishmonger and a carrier of fish who know their business, and whether it is just and reasonable is to be settled by me who am neither fishmonger nor carrier, nor with any knowledge of their business.

*Manchester, Sheffield & Lincolnshire Ry. Co. v. Brown,* 8 App. Cas. 703, 716 (H.L. 1883).

Hartford and Aetna are now in the position where principles of equitable subrogation can be applied to the facts. Since Hartford and Aetna, to use the words of Lord Bramwell, "know their business," they should be able to resolve their dispute.