913 P.2d 505

**CALIFORNIA CASUALTY INSURANCE COMPANY, A California corporation, Plaintiff, Counter-defendant-Appellee,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation, Defendant, Counter-claimant-Appellant.**

No. 1 CA–CV 94–0257.

Court of Appeals of Arizona,
Division 1, Department D.

Feb. 27, 1996.

As Corrected Feb. 28, 1996.

©⎯606(6)

Thomas & Burke, P.C. by Benjamin C. Thomas, David W. Davis, Phoenix, for Plaintiff, Counter–Defendant–Appellee.

Bell & O'Connor, P.C. by David M. Bell, Phoenix, for Defendant, Counter-claimant-Appellant.

## OPINION

SULT, Judge.

Excess liability insurance carrier State Farm Mutual Automobile Insurance Company ("State Farm") appeals from summary judgment declaring that primary carrier California Casualty Insurance Company ("CalCasualty") was not required to reimburse State Farm for attorney's fees and costs it expended in defending a claim against the insured driver because CalCasualty had paid the full amount of its policy limits to a personal injury claimant. The appeal requires us to resolve these issues arising out of the trial court's rulings:

1. whether the language of CalCasualty's policy relieved it of a continuing responsibility to defend the insured driver once it had paid its policy limits to the tort claimant;

2. whether the agreement in exchange for which CalCasualty paid its policy limits to the tort claimant evidenced full compliance by CalCasualty with its contractual duty to defend the insured driver; and

3. whether the doctrine of equitable subrogation did not apply to support State Farm's claim against CalCasualty for reimbursement of defense costs.

## Facts and Procedural Background

There is no dispute about the facts revealed by the record. CalCasualty insured a 1980 Subaru Station Wagon owned by Ben Campbell. The policy provided liability limits of $100,000 per person. On November 9, 1989, with the owner's permission, one James Wilson was driving the Subaru with Kristine Campbell and Craig Campbell as his passengers. Wilson was also the named insured under his own automobile liability policy issued by State Farm which had liability limits of $100,000 per person.

With Wilson at the wheel, the Subaru was involved in an accident in which Kristine Campbell was injured. Campbell claimed that Wilson was at fault. Both CalCasualty's and State Farm's policies provided liability coverage for Wilson for claims arising out of the accident. Pursuant to Ariz.Rev.Stat.Ann. (A.R.S.) section 28–1170.01(B) (1989), CalCasualty's policy was deemed to provide primary coverage, while State Farm's policy was deemed to provide excess coverage.

Before Kristine Campbell commenced any litigation against Wilson, CalCasualty entered into settlement negotiations with her through her attorney, Lorin Tobler. On May 18, 1990, Tobler made the following proposal to CalCasualty adjuster Matt Tokasey:

Accordingly, as per our telephone conversation, demand is hereby reaffirmed in the full amount of your policy limits which I understand to be $100,000. . . .

In exchange for the payment of your liability policy limits our client agrees to release your company as to its liability coverage and to release James Wilson as to any personal liability he may have above and beyond any applicable insurance coverages. It is our intent to pursue any other insurance coverages which may be applicable to Mr. Wilson's liability for our client's

injuries. Accordingly, if you have not agreed to pay your policy limits by June 2, 1990, we will proceed immediately with litigation.

Tokasey thereafter prepared a "Release of All Claims" on a standard form, by which Kristine Campbell and her husband would release all claims against James Wilson, Ben Campbell and his wife Janet, and CalCasualty in return for $100,000. This release, however, was not executed as prepared.

In his deposition taken after commencement of these proceedings, Tokasey indicated his agreement with the following statement by attorney Tobler:

I [Tobler] personally came to pick-up the settlement check and release on or about the 23rd of May, 1990. At that time I discovered that James Wilson's name had been erroneously included as one of the parties to be released. At that time you [Tokasey] acknowledged that his name had been included in the release in error, that it was not your intention that he be released and you "whited-out" his name prior to the execution thereof by my clients with the understanding that the release was not intended to release James Wilson.

Tokasey also testified, however, that he intended in executing the modified release to obtain protection for Wilson's personal assets. Tokasey did not notify James Wilson or State Farm of the agreement or its terms.

Notwithstanding Tokasey's intent, Kristine Campbell and her counsel Lorin Tobler later took the position that Tokasey's modified written release, as executed, may have changed the settlement that had previously been reached between Tobler and Tokasey over the telephone. At her deposition, Kristine Campbell testified it was her understanding when she executed the release that she could still recover from James Wilson. In a letter to State Farm's counsel on September 4, 1992, attorney Tobler stated:

... the negotiations with Matt Tokasey leading towards settlement were carried out as set forth in my prior letter to you. However, on the day I went to pick-up the check, Matt Tokasey removed the name of James Wilson from the release and indicated that he did not need to release James

Wilson. I was satisfied with that since my right to pursue Mr. Wilson had been protected. At that point in time I was certainly aware that James Wilson was not being released and this was explained to my client at the time she executed the release.

. . . . .

... if litigation is pursued to its conclusion and the final judgment exceeds policy limits *then I believe we would have a right to proceed against Mr. Wilson for any excess.* (Emphasis added.)

Kristine Campbell filed a personal injury action against James Wilson on June 27, 1991. When State Farm was notified that the complaint had been served, it asked that CalCasualty assume Wilson's defense and informed CalCasualty that it would seek reimbursement of all expenses of the defense it was then providing for him. CalCasualty declined to assume the defense. State Farm kept CalCasualty advised of the status of the case and repeatedly asked it to assume or fund the defense.

In Campbell's action against him, Wilson filed a motion for summary judgment on the theory that the May 24, 1990 release fully protected him and State Farm. On January 13, 1993, the Campbells signed a "reformed" Release and Covenant Not to Execute which provided that in return for CalCasualty's policy limits, Kristine Campbell would not seek satisfaction of any judgment from Wilson's personal assets.

Thereafter, the trial court in Campbell's action granted Wilson partial summary judgment limiting his liability to the extent of his primary and excess insurance coverage. After trial, a jury awarded Campbell $20,000 against Wilson. Because that amount was more than offset by CalCasualty's earlier payment of $100,000, the trial netted Campbell no further recovery.

CalCasualty brought this action against State Farm on August 20, 1993 seeking a declaration that it had owed no duty to defend Wilson after its liability limits had been exhausted and that State Farm had no right to reimbursement for legal expenses of $93,-

357.38 it had incurred in defending Wilson. State Farm counterclaimed for recovery of this sum and other damages.

On cross-motions for summary judgment the trial court ruled for CalCasualty and against State Farm. The trial court reasoned in part:

> ... In its role as the primary insurance provider, California Casualty fully discharged its duties regarding settlement and duty to defend, as defined by its policy:
>
>> "We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted."
>
> The Court finds that this policy provision is clear and unambiguous and is subject to only one reasonable interpretation—that California Casualty will settle or defend any claim and pay defense costs it incurred, and that this obligation terminates when its policy limits are exhausted. Under controlling Arizona case law, an insurer's duty to defend is determined by the language of the insurance policy. *Phoenix Control Systems, Inc. v. Insurance Company of North America*, 161 Ariz. 420, 424 [778 P.2d 1316] (App.1989); citing with approval *Navajo Freight Lines, Inc. v. Liberty Mutual Insurance Company*, 12 Ariz.App. 424, 431 [471 P.2d 309] (1970) and *Kepner v. Western Fire Insurance Company*, 109 Ariz. 329, 330–331 [509 P.2d 222] (1973). Plaintiff's duty to defend has been properly completed and fully exhausted. This exhaustion occurred when California Casualty settled and paid the $100,000 policy limits to the Plaintiff on May 24, 1990 in consideration for receiving a Release of All Claims from the Plaintiff. Subsequently on January 13, 1993, this Release was properly reformed, as reflected in the Release and Covenant Not to Execute signed that date, so as to more accurately reflect the intent of all parties that James Wilson was intended to be included in the May 24, 1990 Release of All Claims.

From formal judgment in accordance with the trial court's ruling, State Farm timely appealed. We have jurisdiction pursuant to A.R.S. section 12–2101(B) (1994).

## I. CalCasualty's Policy Language and its Duty to Defend

■ Relying on the principle that insurance policy language controls the scope and extent of an insurer's duty to defend, CalCasualty contends that as a matter of law its payment of $100,000 to Kristine Campbell was sufficient by itself to end its duty to defend Wilson under the policy that insured the Subaru. However, most decisions from other jurisdictions that have construed language similar to that on which CalCasualty relies have held that a liability insurer's payment of its full policy limits discharges its duty to defend a claim against the insured *only* if made pursuant to a settlement or in full or partial satisfaction of a judgment entered on the claim against the insured. *See Simmons v. Jeffords*, 260 F.Supp. 641, 642 (D.Pa.1966) (if insurer that is unable to effect settlement may avoid defending action by paying policy limits into court, then significant protection provided by policy—defense—would be rendered a near nullity); *Anderson v. United States Fidelity & Guar. Co.*, 177 Ga.App. 520, 339 S.E.2d 660, 661 (1986) (term "exhaust" does not mean paying policy limits into court without insured's consent, but rather paying settlement or judgment that entirely depletes policy limits); *Conway v. Country Cas. Ins. Co.*, 92 Ill.2d 388, 65 Ill.Dec. 934, 936, 442 N.E.2d 245, 247 (1982) (duty to defend is broader than duty to indemnify and is not discharged by mere payment of policy limits); *Samply v. Integrity Ins. Co.*, 476 So.2d 79, 83–84 (Ala.1985) (insurer could not avoid duty to defend by tendering payment of policy limits without settlement or insured's consent). *See generally* Annotation, Liability Insurer's Duty to Defend Action Against an Insured After Insurer's Full Performance of its Payment Obligations Under Policy, 27 A.L.R.3d 1057 (1969).

In *Aetna Cas. & Sur. Co. v. Sullivan*, 33 Mass.App.Ct. 154, 597 N.E.2d 62 (1992) the policy provided: "Our duty to settle or de-

fend ends when we have paid the maximum limits of coverage under this policy." The court rejected Aetna's contention that it was relieved of any further duty to defend when it tendered its policy limits without obtaining a release. The court stated:

> Were we to interpret the policy language ... as Aetna does, an insurer would be free, regardless of the merits of a personal injury claim, to tender the coverage limits to the claimant and decline to defend further whenever the insurer anticipates that the cost of providing a defense would exceed the amount of coverage. The duty to defend generally relied upon by insured motorists would, thus, be significantly nullified in a large number of cases.

> . . . . .

> Uniformly, courts construing such policies have ruled that an insurer's tender of the policy limits does not end its duty to defend a claim against its policyholder unless the payment is made after a judgment or settlement.

597 N.E.2d at 65, 66.

The Arizona cases that deal with the discharge of a liability insurer's duty to defend are consistent with the rule applied in the foregoing cases. In *Continental Cas. Co. v. Farmers Ins. Co. of Arizona*, 180 Ariz. 236, 883 P.2d 473 (App.1994), Division Two of this court favorably acknowledged case law from other jurisdictions holding that a primary insurer's payment or tender of policy limits without obtaining a release of the insured or full or partial satisfaction of a judgment did not discharge its duty to defend the insured. The court stated:

> In this case, the record is clear that Farmers had paid its policy limits and had complied with its duty to defend its insured by obtaining a covenant not to execute on his behalf. Although not a complete release, in view of the existence of excess coverage, it was as complete as Farmers could obtain under the circumstances.... [U]nder the facts in the present case, Farmers' duty to defend was discharged pursuant to its policy provision and therefore CNA had no right of subrogation for defense costs.

*Id.* at 239, 883 P.2d at 476; *see also Cagle v. Home Insurance Co.*, 14 Ariz.App. 360, 483 P.2d 592 (1971). *See generally* Annotation, Allocation of Defense Costs Between Primary and Excess Insurance Carriers, 19 A.L.R.4th 107, 123–33 (1983).

We conclude that CalCasualty's payment of its $100,000 policy to Kristine Campbell was not by itself sufficient to discharge its contractual duty to defend Wilson against Campbell's claim. This necessarily leads to the next question of when, or whether, CalCasualty's duty to defend terminated.

## II. Effect of the May 24, 1990 "Release of All Claims"

As we read its ruling, the trial court determined that CalCasualty discharged its duty to defend when it exhausted its policy limits by paying Kristine Campbell $100,000 and obtaining the "Release of All Claims" that was executed in May 1990. The trial court apparently concluded that the reformation accomplished by the execution of a "Release and Covenant Not to Execute" two and one-half years later operated retroactively not only between the parties to the original agreement but also as to Wilson, who was not a party to or beneficiary of the 1990 release when it was originally executed.

Reviewing the pertinent chronology, we note that the CalCasualty adjuster's initial intention was to secure from Campbell a release protecting Wilson from any personal liability over applicable insurance. That is apparently what the adjuster and Kristine Campbell's attorney agreed on before the 1990 release was signed. For whatever reason, however, that is not what the adjuster actually provided. Instead, the adjuster determined that it would be adequate for CalCasualty's purposes to remove James Wilson's name from the release document as a person expressly released. The effect on Wilson of CalCasualty's omission was to leave an opening for the plaintiff to contend over the succeeding thirty months that Wilson's personal assets were potentially subject to liability. This is precisely what happened when both the plaintiff personally and her attorney indicated Wilson's assets would be sought after to satisfy any judgment in ex-

cess of State Farm's liability limits. Moreover, State Farm itself was threatened by plaintiff's attorney for insurer bad faith if such a recovery were had against Wilson, a threat which was viable only if Wilson's personal assets were unprotected by the 1990 release.

The plaintiff did not actually yield her claim for liability against Wilson in excess of applicable insurance until January 13, 1993, when she signed the "Release and Covenant Not to Execute." This reformed release did have the effect of protecting Wilson's personal assets and, consequently, under *Continental Cas. Co. v. Farmers Ins. Co. of Arizona,* 180 Ariz. 236, 883 P.2d 473 (App.1994), the document did terminate CalCasualty's duty to defend as of that date.[1] We hold, however, that this reformation did not operate retroactively to deprive Wilson of any right which may have accrued to him in the interim between the accident and the reformed release.

The parties to a release are free to reform it to conform to their original intention. *Krenz v. Medical Protective Co. of Fort Wayne,* 57 Wis.2d 387, 204 N.W.2d 663, 666 (1973); *see also Home Owners' Loan Corp. v. Bank of Arizona,* 54 Ariz. 146, 155, 94 P.2d 437, 441 (1939). As to the parties, such reformation relates back to the date of the original instrument. *L.E. Myers Co. v. Harbor Ins. Co.,* 67 Ill.App.3d 496, 24 Ill.Dec. 182, 186, 384 N.E.2d 1340, 1344 (1978), *aff'd* 77 Ill.2d 4, 31 Ill.Dec. 823, 394 N.E.2d 1200 (Ill.1979). Whether the reformation can affect third parties depends upon whether they had notice of the mistake or of facts which should put them on inquiry notice. *Id.* 24 Ill.Dec. at 186–87, 384 N.E.2d at 1344–45. Generally, reformation cannot negatively impact the interest of an innocent third party who has acquired an intervening right or rightfully relied on the unreformed instrument to his detriment. *See id.* at 187, 384 N.E.2d at 1345 and authorities cited therein.

Applying these principles to our case, we first note that Wilson had no actual or constructive notice that the 1990 release was intended by all parties thereto to release his personal assets from execution. He was not informed of the release at the time of its execution and the communication concerning it thereafter clearly indicated that at least one of the parties to the release considered his assets very much at risk. Until the January 1993 reformation was accomplished, Wilson was quite justified in perceiving the necessity of defending vigorously against plaintiff's action in order to protect his personal estate. In this context, Wilson is unquestionably an innocent third party who cannot now be retroactively deprived of his right to recover the cost of his defense.

### III. Applicability of Doctrine of Equitable Subrogation

We have focused the discussion above on Wilson's rights since State Farm's capacity to recover, if at all, is a derivative one. That is, an excess carrier is subrogated to the rights of the insured and may assert against a primary carrier only a claim that derives from the primary's contract with the insured. *See Hartford Acc. & Indem. Co. v. Aetna Cas. & Sur. Co.,* 164 Ariz. 286, 291, 792 P.2d 749, 754 (1990). *See generally* Annotation, 19 A.L.R.4th 107, 127–30 (1983). There is no separate duty here flowing from the primary carrier to the excess carrier on which State Farm can premise a claim. *See Twin City Fire Ins. Co. v. Superior Court,* 164 Ariz. 295, 792 P.2d 758 (1990).

We have established that CalCasualty owed Wilson a continuing contractual duty to defend him against the plaintiff's claims during the period beginning May 24, 1990 and ending January 13, 1993. State Farm, Wilson's excess carrier, in fact bore that defense burden. State Farm is therefore equitably

---

1. The dissent raises a number of arguments concerning the validity of the holding in *Continental Cas. Co. v. Farmers Ins. Co. of Arizona.* We have declined to address these arguments because the case was not cited or discussed until appellant's reply brief. Consequently, we do not have the benefit of appellee's thinking on the issue.

A reply brief is to be confined to a rebuttal of points urged in appellee's brief. Ariz.R.Civ. App.P. 13(c). An argument raised for the first time in a reply brief will not be considered, even if it is legally sound. *Miller v. Boeger,* 1 Ariz.App. 554, 559, 405 P.2d 573, 578 (1965).

subrogated to Wilson's contractual rights against CalCasualty, which right includes reimbursement for the defense costs State Farm incurred during that time. The trial court erred in holding to the contrary.

Based on the foregoing, we reverse and remand for proceedings consistent with this opinion.

GARBARINO, P.J., concurs.

LANKFORD, Judge, concurring in Part and dissenting in Part.

While I agree with the majority that the excess carrier is entitled to recover defense costs from the primary carrier, I disagree with the conclusion that only some costs can be recovered. My reasoning also differs substantially from the majority's.

The majority holds that the primary carrier did not effectively discharge its duty to defend by paying its policy limits without obtaining an effective covenant not to execute against the insured. In my view, the primary carrier does not discharge its duty to defend even when it obtains such a covenant. Instead, the duty is extinguished only when the insurer either settles the claim by obtaining a complete release or pays a judgment against the insured.

There are several reasons that a covenant not to execute fails to extinguish the duty to defend. First, the insurance contract requires more. California Casualty's policy relieves it of the duty to defend only when it settles the claim against the insured or pays a judgment. Mere payment of the policy limits without protection of the insured is insufficient. *See, e.g., American Family Life Assurance Co. v. United States Fire Co.,* 885 F.2d 826, 831 (11th Cir.1989) (tender of policy limits did not relieve the primary insurer of its duty to provide a defense).

The clear intent of the policy language is that the insurer is relieved of its duty to defend only when the insured has been fully protected against liability and litigation. The insured is protected from further liability exposure and from the burden of defending only when the insurer obtains a complete release or pays a judgment.

A covenant not to execute against the insured's personal assets does not fully protect the insured because it permits the plaintiff to proceed with the litigation against the insured. The primary insurer contractually agreed to provide a defense. That duty is independent from, and broader than, the duty to pay a liability claim. 7C John A. Appleman, Insurance Law and Practice § 4684, at 83 (Walter F. Berdal ed., rev. ed. 1979). Thus, the fact that the insurer has paid its limits and obtained a covenant does not erase the insured's need for a defense provided by the insurer.

Nor does a covenant fully protect the insured from liability. Such a covenant may protect the insured's personal assets from execution, but it does not prevent the entry of a judgment against the insured. That judgment is a debt of the insured. Although both plaintiff and the insured expect the excess carrier to pay that debt, the legal liability is the insured's and not primarily the carrier's. In fact, it is because the insured is legally liable that the excess carrier has the duty to pay. Thus, the primary carrier does not fully protect the insured from legal liability by obtaining a covenant, and consequently it does not fully discharge its duty to defend by securing such an agreement.

The second reason that obtaining the covenant does not discharge the duty to defend is that the primary carrier's duty cannot be measured by the availability of excess coverage. The carrier's duty to defend is instead defined by its contract with its insured, together with any public policy concerns. *See Kepner v. Western Fire Ins. Co.,* 109 Ariz. 329, 330, 509 P.2d 222, 223 (1973); *Navajo Freight Lines, Inc. v. Liberty Mut. Ins. Co.,* 12 Ariz.App. 424, 431, 471 P.2d 309, 316 (App.1970). The fact that State Farm covered the insured's additional $100,000 of liability, which remained after California Casualty obtained the covenant, is therefore irrelevant to defining California Casualty's duty. "[The primary carrier's] duty to defend is no different than if there were no excess insurance policy at all." *Bituminous Casualty Corp. v. Iowa Nat'l Mut. Ins. Co.,* 132 Ill.App.3d 868, 87 Ill.Dec. 568, 570, 477 N.E.2d 694,

696 (1985). Stated another way, the primary carrier clearly would not have discharged its duty to defend by paying its policy limits and leaving the insured exposed to $100,000 in additional liability. Because the presence or absence of excess coverage is irrelevant to defining the primary carrier's contractual duties, California Casualty did not discharge its duty to defend by obtaining a covenant that left $100,000 in remaining liability.

The third reason that a covenant cannot discharge the duty is that the contrary rule would encourage primary carriers to unfairly shift their defense costs to excess carriers. *Cf. Aetna Casualty & Sur. Co. v. Sullivan*, 33 Mass.App.Ct. 154, 597 N.E.2d 62, 65 (1992) (A rule that insurer could escape the duty to defend by tendering policy limits would create an incentive to tender "whenever the insurer anticipates that the cost of providing a defense would exceed the amount of coverage. The duty to defend ... would, thus, be significantly nullified in a large number of cases.").

Indeed, the facts of this case illustrate how that may occur. California Casualty paid $100,000—on a claim ultimately proved to be worth only $20,000—and refused to defend further. By paying its policy limits and refusing to defend further, California Casualty thereby shifted $93,000 in defense costs to State Farm. The economic incentive to primary carriers is obvious: California Casualty opted to pay $100,000 in liability costs rather than continue to defend and incur $113,000 in total liability and defense costs, a savings to it of $13,000. The potential unfairness to excess carriers is equally apparent: State Farm was forced to bear $93,000 in defense costs on a claim for which it had no liability whatsoever.

A final reason to require the primary carrier to continue the defense is to avoid the disruptive effects of shifting the defense. "[I]t is undesirable to allow a situation that permits one insurer and its attorneys to withdraw from further handling of a claim and require a new staff and its attorneys to step into the negotiations and litigation." Appleman, *supra*, § 4682 at 37. To force the changing of legal horses in midstream is not only clearly disadvantageous to the insured, it increases total defense costs.

The only rule that avoids this unjust and inefficient result is this: The duty to defend is satisfied only by either settlement with a complete release or payment of a judgment. Requiring the primary carrier to continue defending even if it obtains a covenant not to execute removes any incentive for the primary carrier to avoid its contractual duty of paying defense costs by paying its policy limits on a claim worth less than the policy limits. This rule gives the insured what he purchased from the primary carrier: a defense. It also avoids placing defense costs on excess carriers who may have no liability on the claim.

This rule is also fair to the primary carrier. It has been paid premiums to defend. Requiring it to defend merely means that it must do what it has been paid to do. If the insured has other coverage, that fact alone does not justify the primary insurer's escape from its contractual duties. The primary carrier is not entitled to avoid or reduce its defense costs based on the fortuity of excess coverage and at the expense of the excess carrier. Requiring the primary insurer to continue its defense induces the primary carrier to cooperate with the excess insurer in settling any claim that implicates the excess coverage. At the same time, it does not place the excess carrier in an unfairly superior bargaining position.

*Continental Casualty Co. v. Farmers Ins. Co.*, 180 Ariz. 236, 883 P.2d 473 (App.1994) admittedly says otherwise, but in that case the court did not consider the effect of a covenant on the insured, the economic incentives created by allowing primary carriers to shift the defense to excess carriers, or the requirement that the duty to defend be defined by the insurance policy. In addition, the assertion in that decision that a covenant is "as complete" a settlement as the primary carrier could obtain, *id.* at 239, 883 P.2d at

476, is incorrect. When a claim is settled for less than policy limits, the primary carrier can obtain a complete release. When a claim exceeds the policy limits, the primary and excess carriers can participate in a full settlement, again obtaining a complete release.

For these reasons, I cannot fully concur in the majority opinion.