THE L. E. MYERS CO., Plaintiff-Appellee, *v.* THE HARBOR INSURANCE CO., Defendant-Appellant.

First District (2nd Division)   No. 77-1191

Opinion filed December 19, 1978.

Schaffenegger, Watson and Peterson, Ltd., of Chicago (Jack L. Watson, of counsel), for appellant.

French & Rogers, of Chicago (Richard G. French and Timothy G. Keating, of counsel), for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This is an action by the L. E. Myers Co. (Myers) against the Harbor Insurance Company (Harbor) seeking an order that a certain excess insurance policy issued by Harbor affords coverage to Myers for an event which occurred in Madison, Wisconsin, on January 11, 1975. The parties filed cross motions for judgment on the pleadings, pursuant to section 45(5) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 45(5)). After a hearing on the motions the court entered an order in favor of Myers which stated that the Harbor policy is controlled by its terms by the underlying primary policy, as voluntarily reformed by the parties thereto, Myers and the Continental Insurance Company (Continental), and that Harbor owes Myers coverage up to the excess of its policy over the amount of the underlying Continental policy. From this portion of the order, Harbor appeals.[1]

■■ Because the parties have filed cross motions for judgment on the pleadings, all well pleaded facts in the pleadings will be taken as true. (*Zipf v. Allstate Insurance Co.* (1977), 54 Ill. App. 3d 103, 369 N.E.2d 252.) The facts of the case are as follows:

Myers is in the business of constructing electric transmission towers and lines and was so engaged under contract with the Madison Gas & Electric Company (Madison). Prior to beginning construction, Myers, through its broker, Marsh & McLennan, Inc. (Marsh), sought to obtain liability insurance. Myers was issued a primary insurance policy in the amount of $100,000 by Continental and an excess policy in the amount of $1,000,000 by Harbor, with the provision that Harbor's "umbrella liability" policy afforded Myers the same coverage as Continental's underlying primary policy. The premium for Harbor's coverage for three years came to $81,405, $27,135 per year.

Myers embarked upon its contract with Madison and erected the towers and installed the lines, but on January 11, 1975, within the period covered by the policies involved, some 63 miles of transmission lines and towers toppled during a windstorm, resulting in the filing of an action by

---

[1] The court's order also denied Myers' prayer for attorney's fees.

Madison against Myers seeking damages in the amount of $10,000,000.[2]

Upon being served with process on February 21, 1975, Myers gave notice of the Madison lawsuit to Continental, who in turn engaged the services of counsel pursuant to its underlying policy. Within a few days, Marsh, acting on behalf of Myers, forwarded a copy of the summons and complaint to Harbor's general agent, Leslie H. Cook, Inc. On August 11, 1975, Harbor wrote to Myers acknowledging its umbrella liability coverage up to the excess of its policy over the primary policy. However, on September 15, 1975, Harbor again wrote to Myers, this time denying coverage. Sometime during the period between the two letters, Harbor, admittedly for the first time, saw a copy of the underlying Continental policy and noticed that endorsement no. 7 of that policy excludes liability for property damage to work performed by the insured.[3] Since the Madison lawsuit was seeking to recover the cost of reproducing the transmission lines and towers, Harbor informed Myers that there was no coverage for the occurrence under the primary policy and that therefore there was no coverage under Harbor's excess policy.[4]

Upon receipt of the foregoing distressing information, Myers consulted with its broker, Marsh, and on December 22, 1975, Marsh sent a letter to Continental pointing out that Continental had erred in issuing the primary policy in that the parties had agreed that the exclusion was to be limited to a certain job in Columbus, Nebraska. Instead, an unrestricted exclusion was erroneously inserted and Marsh missed the error when Marsh reviewed the policy before sending it on to Myers. Marsh requested of Continental that the policy be reformed to reflect the intent of the parties, Myers and Continental. By a letter dated January 28, 1976, Continental acknowledged to Marsh that a mistake had been made and agreed to reform the policy to reflect the true agreement of the parties. Continental then caused to be issued endorsement no. 7A, limiting the exclusion to the Columbus, Nebraska, job and superseding endorsement no. 7.

---

[2] While Myers' complaint states that a copy of the complaint in the Madison action has been attached and made an exhibit in this case, the Madison complaint does not appear in the record or the excerpts from the record.

[3] The actual language of the exclusion is as follows:

"With respect to the completed operations hazard, to property damage to work performed by the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith."

The parties have never raised the question whether the occurrence that is the subject of the Madison lawsuit, the toppling of the towers and lines during a windstorm, necessarily falls within the exclusion just quoted.

[4] The parties have also never raised the question whether the Madison lawsuit might not have been seeking recovery for other incidental damage also, rather than just property damage to the completed work product, such that an obligation to defend might exist even if the occurrence does fall largely within the exclusion. Myers simply alleges that the Madison suit seeks recovery for replacement of the lines, and the Madison complaint, as noted in footnote 2, does not appear in the record.

Harbor refused to be bound by endorsement no. 7A, whereupon Myers instituted this lawsuit and prayed the court to reform the Harbor policy "to express the intent of the parties, or, in the alternative, to declare that the HARBOR policy is controlled by its terms by the reformed underlying Continental policy, and that HARBOR owes coverage to MYERS * * *."

Harbor initially argues that the Harbor policy by its terms does not afford coverage. The vehicle by which Harbor agreed to insure Myers on the same terms as Continental is known as a "broad as primary" endorsement, by which the excess insurer agrees to be bound by the terms of the underlying primary policy, notwithstanding any more restrictive terms in the excess policy. Although it had never seen the primary policy, Harbor originally refused to approve the "broad as primary" endorsement submitted to it by Marsh. Rather, Harbor returned the endorsement to Marsh, requesting that it be amended by insertion of the word "now." The endorsement (variously referred to as rider no. 1 or endorsement no. 6 of the Harbor policy) was accordingly amended to read as follows:

> "It is understood and agreed that in the event of loss for which the Insured now has coverage under the Underlying Insurances set out in the attached schedule, the excess of which would be recoverable hereunder, except for terms and conditions of this policy which are not consistent with the underlying, then, notwithstanding anything contained herein to the contrary, this policy shall be amended to follow the terms and conditions of the applicable underlying insurances in respect of such loss."

As the Harbor policy itself excludes liability for the loss for which recovery is sought (exclusions (d) and (e) of Harbor policy), the Harbor policy would only afford coverage to Myers if the loss that occurred was one "for which the Insured *now* has coverage under the Underlying Insurances * * *." (Emphasis supplied.) As it is conceded that the underlying Continental policy contained an exclusion at the time the above endorsement became effective, Harbor argues that there is no coverage under its policy.

On appeal, as in the court below, Harbor argues that it insisted on the insertion of the word "now" just to prevent such subsequent revision, amendment, or reformation of the underlying policy as Myers and Continental have engaged in. Harbor further argues that even if reformation of the Continental policy would be proper as between Myers and Continental, the policy could not be reformed as against Harbor. In support, Harbor relies upon *Pulley v. Luttrell* (1958), 13 Ill. 2d 355, 148 N.E.2d 731, which held that equity would not reform a deed predicated upon a mutual mistake of fact as against subsequent *bona fide* purchasers

for value, without notice of the mistake or of facts which should put them on inquiry. Harbor contends that the same logic should apply in the case at bar and that it should prevail because it had no notice or knowledge of the mistake. Harbor submits that to allow Continental, Myers, and Marsh to reform the underlying policy in such a manner that Harbor is now required to afford coverage retroactively is contrary to Harbor's specific contractual undertaking, Illinois law, and all possible equitable considerations.

Myers initially takes umbrage to Harbor's description of the instant action as one to reform the Continental policy. Myers points out that the action was brought to reform the Harbor policy or to declare, as the trial court eventually did, that the Harbor policy is bound by its terms by the previously reformed Continental policy. Myers further observes that Harbor does not dispute that the erroneous insertion of the exclusion was such a mutual mistake of fact as to constitute a classic case for application of the doctrine of reformation, as stated by our supreme court in *Harley v. Magnolia Petroleum Co.* (1941), 378 Ill. 19, 28, 37 N.E.2d 760, as follows:

"An action to reform a written agreement rests upon a theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake, * * * some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon, by inserting the provisions omitted or striking out the one inserted by mutual mistake."

Myers then argues that the only issue is whether Harbor is such a third party as can complain about voluntary reformation by the parties to a contract. Myers distinguishes cases involving deeds as dealing with peculiarly public documents which operate as public notice and on which, though erroneously drafted, *bona fide* purchasers have relied. Myers then points to cases involving reformation as affecting third parties on the other side of the spectrum, such as *New York Life Insurance Co. v. Rak* (1961), 30 Ill. App. 2d 86, 173 N.E.2d 603, *aff'd* (1962), 24 Ill. 2d 128, 180 N.E.2d 470, in which reformation of a life insurance policy to change the beneficiary was permitted after the death of the insured, though it eliminated rights that had accrued under the policy. While conceding that the instant case falls somewhere between the two extremes, Myers argues that the doctrine that emerges is that reformation should be permitted unless it will injure an innocent third party who has relied on the erroneously expressed instrument to his detriment, which, Myers argues, Harbor cannot show because it never read the Continental policy before issuing its own policy, and has never alleged that it would have charged a

different premium or would not have written the policy with the exclusion as reformed.

Myers further argues that the policy by its terms does afford coverage, even with the insertion of the word "now" in the "broad as primary" endorsement. Without citing any authority, Myers declares that the salient feature of reformation is that it relates back to the date of the instrument reformed. While the word "now" may have been intended to protect Harbor from any change in coverage by way of subsequent revision or modification, Myers argues, it could not have been intended to prohibit reformation of a mutual mistake in the policy or prevent that reformation from relating back. Rather, Myers contends, use of the phrase "now has coverage" without having looked at the underlying Continental policy indicates that Harbor intended to provide the coverage actually agreed upon by Myers and Continental on that date, not as mistakenly set down in writing, such that Harbor should not be able to deny coverage after the loss in the absence of a showing of reliance on the agreement as erroneously expressed.

Harbor responds by pointing out that the cases involving subsequent *bona fide* purchasers speak only in terms of whether there was notice of the mistake, not reliance. Harbor also cites another statement of the rule, to the effect that reformation will not be granted to the prejudice of innocent third persons. (76 C.J.S. *Reformation of Instruments* §54, at 405-06 (1952).) Citing a line of cases beginning with *Sinopoulo v. Jones* (10th Cir. 1946), 154 F.2d 648, in which reformations of trust conveyances were held not binding on the Internal Revenue Service for tax purposes, Harbor also argues that while reformation may relate back as between Myers and Continental, as to Harbor, a third party without notice of the mistake, the reformation is effective only from the date thereof.

The parties are in agreement that insurance policies may be reformed on the same grounds as any other written contracts. (See generally 13A Appleman, Insurance Law & Practice §§7607—19 (1976); 17 Couch on Insurance §§66:1-164 (2d ed. 1967); R. N. Covington, *Reformation of Contracts of Personal Insurance*, 1964 U. Ill. L.F. 548; Annots., 32 A.L.R.3d 661 (1970), 25 A.L.R.3d 1232 (1969), 25 A.L.R.3d 580 (1969), 1 A.L.R.3d 885 (1965).) Neither do the parties dispute that, as between Myers and Continental, there existed such a mutual mistake of fact as would warrant reformation (*e.g., Metropolitan Life Insurance Co. v. Henriksen* (1955), 6 Ill. App. 2d 127, 126 N.E.2d 736; *Stoltz v. National Indemnity Co.* (1952), 345 Ill. App. 495, 104 N.E.2d 320), nor that the general rule is that reformation relates back to the date of the reformed instrument as to the parties thereto (*e.g.,* 66 Am. Jur. 2d *Reformation of Instruments* §11 (1973); 76 C.J.S. *Reformation of Instruments* §93a

(1952)). There is also apparent agreement that in a proper case for reformation, the parties may do voluntarily what a court of equity would have compelled them to do, and with the same effect.[5] *Coakley v. State* (N.Y. Ct. Cl. 1960), 20 Misc. 2d 831, 196 N.Y.S.2d 793; *Feltham v. Blunck* (1921), 34 Idaho 1, 198 P. 763; *Hutchinson v. Chicago & N.W. Ry. Co.* (1877), 41 Wis. 541.

■■ Rather, the only issue is whether, and in what circumstances, reformation will be permitted, or permitted to relate back, as against third persons. (See generally Annot., 79 A.L.R.2d 1180 (1961), supplementing Annot., 44 A.L.R. 78 (1926).) The cases on the extremes are clear: while equity will not reform a deed against subsequent *bona fide* purchasers for value, without notice of the mistake or of facts which should put them on inquiry (*e.g., Pulley v. Luttrell* (1958), 13 Ill. 2d 355, 358), reformation will be permitted, and be permitted to relate back, against the parties to the agreement and against "those claiming under them in privity, such as personal representatives, heirs, devisees, legatees, donees or voluntary transferees, or subsequent purchasers or encumbrancers with notice of the facts." 66 Am. Jur. 2d *Reformation of Instruments* §63, at 584 (1973); accord, *Remus v. Schwass* (1950), 406 Ill. 63, 92 N.E.2d 127 (heirs); *Kolkovich v. Tosolin* (1974), 19 Ill. App. 3d 524, 311 N.E.2d 782 (devisees); *Schuline v. Pelzer* (1971), 2 Ill. App. 3d 791, 276 N.E.2d 832 (purchasers with notice).

However, in cases which fall between the extremes the issue is clouded in that the applicable rule is often stated more broadly than the facts of the case, the cases cited, and the illustrations furnished would seem to warrant, as is evidenced by two formulations of the rule advanced by Harbor. (45 Am. Jur. *Reformation of Instruments* §68, at 624-25 (1943) (no reformation "to the injury of innocent third persons such as bona fide purchasers and lien holders without notice, and others who have acquired intervening or vested rights and who cannot be placed in statu quo"); 76 C.J.S. *Reformation of Instruments* §54, at 405 (1952) (no reformation "to the prejudice of innocent third persons").) This is not peculiar to secondary sources cited by Harbor (see also 13 Williston, Contracts §1547 (3d ed. Jaeger 1970); Restatement of Contracts §504 (1932); 76 C.J.S. *Reformation of Instruments* §28, at 361-63 (1952)), and the same phenomenon has occurred in cases in this State. See *Dillard v. Jones* (1907), 229 Ill. 119, 126, 82 N.E. 206 (court stated that reformation is permissible "when the * * * rights of innocent third parties have not

---

[5] An initially troublesome aspect of the voluntary reformation in the case at bar is that, had Myers brought an action for reformation against Continental, Myers would probably have had to join Harbor, as Harbor's rights would very possibly be affected by the outcome. (See e.g., 66 Am. Jur. 2d *Reformation of Instruments* §100 (1973).) However, as Harbor has fully had an opportunity to contest that issue in this action, we do not believe that it has been prejudiced by the voluntary nature of the reformation *per se.*

intervened," while the case involved a *bona fide* purchaser); *Gatton v. Page* (1976), 44 Ill. App. 3d 559, 561, 358 N.E.2d 685 (no reformation "so as to affect the intervening rights of third parties or against purchasers for value without notice," while the case involved only purchasers for value without notice).

Despite such broad formulations of the rule, reformation has been permitted against the intervening rights of third persons such as sureties (*Henkleman v. Peterson* (1895), 154 Ill. 419, 40 N.E. 359 (overruling *Trustees of Schools v. Otis* (1877), 85 Ill. 179)), assignees for the benefit of creditors (*Willis v. Henderson* (1842), 5 Ill. (4 Scam.) 13), and general or judgment creditors (*Federal Land Bank v. Kenshalo* (1930), 258 Ill. App. 1). More particularly, in cases involving insurance policies, reformation has been permitted although it would extinguish the accrued rights of beneficiaries (*New York Life Insurance Co. v. Rak*) or would adversely affect the rights of third party claimants by reducing the insurance proceeds fund from which they might eventually recover. *Truck Insurance Exchange v. Wilshire Insurance Co.* (1970), 8 Cal. App. 3d 553, 87 Cal. Rptr. 604.

Reformation has also been permitted where to hold otherwise would permit a third person who had not relied on the erroneously expressed agreement to be "the gratuitous beneficiary" of the parties' mutual mistake. *Coakley v. State* (N.Y. Ct. Cl. 1960), 196 N.Y.S.2d 793, 796 (parties permitted to voluntarily reform a release erroneously expressed in general terms, though rights of inadvertently released state, against which an action was pending, would be adversely affected); *Utica Mutual Insurance Co. v. Monarch Insurance Co.* (1967), 250 Cal. App. 2d 538, 58 Cal. Rptr. 639 (insured and one insurance company permitted to voluntarily reform policy to eliminate coverage as against another insurer over its claim that its rights had intervened); see also *Burlingham v. Hanrahan* (1931), 140 Misc. 512, 251 N.Y.S. 55 (reformation of building restriction agreement permitted as against adjoining lot owners who did not purchase in reliance on erroneously expressed instrument).

■■ Thus, a more precise statement of the rule would seem to be that reformation will generally be granted, and will relate back, "[e]xcept as to bona fide purchasers without notice and those standing in similar relations" (76 C.J.S. *Reformation of Instruments* §93, at 491 (1952)), such as mortgagees or any "subsequent encumbrancers or lienholders for a present consideration." 66 Am. Jur. 2d *Reformation of Instruments* §65, at 589 (1973); see, *e.g., Black v. Richfield Oil Corp.* (S.D. Calif. 1941), 41 F. Supp. 988 (subsequent *bona fide* purchaser under license agreement subject to prior license agreement sought to be reformed, reformation denied); *Yarnell v. Brown* (1897), 170 Ill. 362, 48 N.E. 909 (assignee of attachment judgment held to prevail over prior mortgage sought to be

reformed to extent of the consideration given by him for the assignment before he had notice of the mortgagee's equity of reformation); *Hallberg v. Harriet* (1919), 93 Ore. 678, 184 P. 549 (holders in due course); *Morris v. Hillman Investment Co.* (1918), 99 Wash. 276, 169 P. 837 (assignee of contract for value who entered on land and made valuable improvements thereon in reliance on erroneously expressed instrument); *Holton State Bank v. Greater Milwaukee Food Merchants Association, Inc.* (1960), 9 Wis. 2d 95, 100 N.W.2d 322 (subsequent lienholder advancing consideration in reliance on instruments as presented); *cf. Mutual Life Insurance Co. v. Metzger* (1934), 167 Md. 27, 172 A. 610 (reformation of insurance policy to reduce amount due beneficiary permitted, but beneficiary to be compensated to extent of sum spent in reliance on the policy as erroneously expressed).

A further qualification supported by the cases is that reformation should not be granted or be permitted to relate back where it would somehow be against the public interest to do so. (See *Interstate Indemnity Co. v. Simpson* (D. Ore. 1957), 155 F. Supp. 855 (reformation permitted except as to coverage furnished pursuant to statutorily required policy endorsement); *State v. Kahua Ranch, Ltd.* (1963), 47 Haw. 28, 384 P.2d 581 (reformation of lease of public lands sold at public auction pursuant to statutorily required notice of contents of lease denied).) The chief application of this doctrine has been in cases holding that the Internal Revenue Service is not bound by reformations of trust conveyances after tax obligations have been determined. (*E.g., M.T. Straight's Trust v. Commissioner of Internal Revenue* (8th Cir. 1957), 245 F.2d 327; *Sinopoulo v. Jones* (10th Cir. 1946), 154 F.2d 648. Contra, *Flitcroft v. Commissioner of Internal Revenue* (9th Cir. 1964), 328 F.2d 449.) It has been stated that to hold otherwise would leave Federal tax liabilities in an unacceptably unsettled state as well as provide the opportunity for collusive State court actions or voluntary reformations. *Van Der Wymelenberg v. United States* (7th Cir. 1968), 397 F.2d 443, 445.

Applying these principles to the instant case, Harbor cannot be said to be a *bona fide* purchaser or similarly situated, as it was willing to insure on the same terms as the agreement between Continental and Myers and could not have relied on the erroneously expressed instrument because Harbor never saw it until after the loss had occurred. Harbor's lack of knowledge of the mistake cannot be considered determinative in the absence of reliance on the mistakenly drafted instrument. In addition, the voluntary reformation was against Continental's interest in the amount of $100,000, militating against the possibility of collusion.

All that remains to be considered is the effect of an Illinois case, some of the facts of which are strikingly similar to those in the case at bar. In *Vial v. Norwich Union Fire Insurance Society* (1912), 172 Ill. App. 134,

the plaintiff was issued a fire insurance policy by the Indemnity Fire Insurance Company, which later entered into a reinsurance agreement (as opposed to excess insurance) with the defendant reinsurer, Norwich. The reinsurance agreement provided that Norwich would reinsure all property "now covered by policies and contracts issued by the 'Indemnity' according to their terms and conditions * * *." Approximately one year later a fire occurred, destroying various outbuildings on plaintiff's property. When plaintiff filed claims against both companies, each refused to pay on the ground that the policy issued covered only the plaintiff's dwelling. The plaintiff then brought an action against Norwich alleging that the Indemnity policy was intended to cover all the improvements on plaintiff's property, but that by mutual mistake, only the dwelling was covered.

The court on appeal reversed a decree of reformation. The court began by describing the contract as a third-party beneficiary contract and noting that one of the parties to the contract sought to be reformed was not in court as a party. The court then stated:

> "Before a contract can be reformed in a court of equity for mutual mistake as against persons not parties to it, but who have rights or liabilities that would be affected by its reformation, it must appear * * * that such persons are not innocent parties. It must be averred and proven that such persons knew or had notice, either actual or constructive, of the mistake sought to be reformed at the time he acquired his interest or incurred his liability. (Sickmon v. Wood [1873], 69 Ill. 329; Harms v. Coryell [1898], 177 Ill. 496-504; Barton v. Mayers [1899], 183 Ill. 360-362; Russell v. Ranson [1875], 76 Ill. 167), or that such third person has by some act, stipulation or agreement estopped himself from relying on the want of knowledge or notice of such mistake, as a means of protecting his interests." (172 Ill. App. 134, 140.)

Finding that there was no proof that Norwich had any notice or knowledge of the claimed mutual mistake or had done anything to be estopped from resisting the reformation, the court then stated that Norwich had agreed to reinsure only property then covered by Indemnity policies "according to their terms and conditions," and not according to some secret terms of which Norwich had no notice.

The decision was affirmed by the supreme court (257 Ill. 355, 100 N.E. 929), but on different grounds, without any reference to the appellate court's reasoning. Instead, the supreme court ruled that the contract was merely one of indemnity between the two insurance companies, rather than a third-party beneficiary contract, such that the plaintiff had no standing to sue the reinsurer whatsoever. Besides the possibility of its being colored by its erroneous third-party beneficiary

approach, the appellate court decision also rested on the ground that the evidence of mutual mistake was insufficient to warrant reformation and on the ground that a party to the contract sought to be reformed was not in court. Furthermore, all of the cases cited by the court for its reasoning quoted above dealt with the *bona fide* purchaser issue, where the question of notice of the mistake is determinative; as our analysis above has demonstrated, the applicability of that rationale in this context is questionable.

Even within the framework of the appellate court's analysis in *Vial*, we also question whether Harbor might not be estopped from relying on the mistake to deny coverage, as the trial court apparently believed. Harbor obviously intended its coverage to be as broad as that actually agreed upon by Myers and Continental. While the insertion of the word "now" may have been intended to prevent subsequent modifications of that agreement, it could not have been intended to permit Harbor to take advantage of an error in setting down the agreement when Harbor was willing to be bound in advance to its terms without ever reading it. We do not think that it should be so interpreted.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.