**OTA LIMITED PARTNERSHIP,**

v.

**FORCENERGY, INC.**

**No. CIV.A. 00–4744.**

United States District Court,
E.D. Pennsylvania.

Nov. 14, 2002.

Ronald P. Schiller, Elizabeth J. Fenney, Piper, Marbury, Rudnick & Wolfe, LLP, Philadelphia, PA, Douglas Rappaport, Joshua S. Sohn, Piper Marbury Rudnick & Wolfe, LLP, New York City, for plaintiff.

Alan K. Cotler, Joan A. Yue, Reed Smith LLP, Philadelphia, PA, Andrew P. Hoppes, Reed Smith LLP, Philadelphia, PA, for defendant.

### MEMORANDUM OF DECISION

RUETER, United States Magistrate Judge.

Presently before the court are defendant's motion for partial summary judgment (Document No. 30), and plaintiff's motion for summary judgment (Document No. 31). Each party filed numerous briefs, reply briefs, exhibits and affidavits in support of its own motion and in opposition to the other party's motion. The motions with respect to the reformation issue only were referred to the undersigned for disposition by the Honorable J. Curtis Joyner by order dated July 31, 2002. For the reasons stated below, defendant's motion for partial summary judgment is GRANTED, and plaintiff's motion for summary judgment is DENIED.

## I. BACKGROUND

The basic facts are undisputed and the court will summarize them briefly here. Defendant, Forcenergy, Inc., was an independent oil and gas company engaged in exploring for and producing oil and natural gas.[1] Plaintiff, OTA, is a Delaware limited partnership and is an arbitrageur in the business of investing and trading securities for its own account. (Pl.'s Mem. of Law Supp. Summ. J. at 4.) In June and July, 2000, plaintiff bought approximately 10,000 warrants convertible into common shares of defendant (the "Warrants"). OTA did not purchase the Warrants directly from defendant, but bought them on the second-

---

1. Effective December 7, 2000, Forcenergy merged into Forest Oil Corporation, Denver, Colorado. (Def.'s Br. Supp. Mot. Summ. J. at 4.)

ary market from another seller. *Id.* at 14. Defendant had issued the Warrants approximately three months earlier as part of its Chapter 11 bankruptcy reorganization. Under defendant's Chapter 11 plan of reorganization, defendant sold its unsecured creditors 40,000 "Units," each Unit consisting of one share of defendant's preferred stock and forty-five warrants, each warrant convertible into one share of defendant's common stock at the price of $10.00 per share. (Def.'s Appendix Supp. Summ. J. Exs. 1 and 3.)

Defendant and American Stock Transfer & Trust Company (the "Warrant Agent") entered into a Warrant Agreement dated March 20, 2000. The parties agree that the Warrant Agreement provides that each Warrant may be converted into one share of defendant's common stock, a one to one ratio. The parties agree that the Warrant Agreement contains no errors at the time it was drafted, and accurately reflects the intent of the parties to that agreement. (Pl.'s Mem. of Law Supp. Summ. J. at 16.)

Plaintiff claims that it purchased the Warrants because it believed that each Warrant was convertible into forty-five shares of defendant's common stock, a one to forty-five ratio. *Id.* at 13–14. Plaintiff contends that it believed that only 40,000 Warrants had been issued.[2] Plaintiff asserts that it formed these beliefs after reviewing certain documents including defendant's filings with the United States Securities and Exchange Commission ("SEC"), and defendant's Chapter 11 bankruptcy plan and disclosure statement. *Id.* at 10–14. Plaintiff also claims that it confirmed this conversion ratio in two telephone calls to defendant's employees before purchasing the first batch of Warrants. *Id.* at 13–14. Two of plaintiff's employees, Neil Weiner and David Tattersall, conducted the due diligence on behalf of the plaintiff. *Id.* at 10–14.

The issue before this court is very narrow and discrete: is plaintiff entitled to reformation of the Warrant Agreement to reflect that the Warrants are exercisable at the ratio of one to forty-five, i.e., one Warrant for forty-five shares of common stock. In Count I of the Complaint, plaintiff asked the court to reform the Warrant Agreement to give plaintiff forty-five shares of defendant's common stock for each Warrant it owns, rather than the one share per Warrant as provided in the Warrant Agreement.[3] Defendant seeks the entry of summary judgment on Count I of

**2.** The conversion of 40,000 Warrants into forty-five shares of common stock *each* would result in the 1.8 million shares of common stock devoted to the Warrants.

**3.** Plaintiff confirmed in its Motion for Summary Judgment that, in its Complaint, the document it sought to reform was the Warrant Agreement. (Pl.'s Mem. of Law Supp. Summ. J. at 18.) Plaintiff emphasized that as a purchaser of the Warrants in the secondary market, it succeeded to the rights set forth in the Warrant Agreement, and that it is the *Warrant Agreement* that should be reformed to reflect an exchange ratio of forty-five shares per Warrant. *Id.* at 18–33. However, in its Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, plaintiff argues, apparently for the first time, that the "contract" at issue in this case arose on

June 28, 2000 when plaintiff first purchased the Warrants, and was amended on July 5, 2000 when plaintiff purchased additional Warrants. (Pl.'s Mem. of Law Opp. Summ. J. at 9–12.) It is this separate and independent contract which plaintiff now seeks to reform. *Id.* at 6. The Warrant Agreement, plaintiff now contends, merely sets forth standard terms and conditions which will govern defendant's individualized contracts with each of the warrantholders. *Id.* at 10–11. Plaintiff has offered no facts to support its new argument that a separate individualized contract was created and amended, respectively, on the two dates that it purchased the Warrants. Plaintiff did not purchase the Warrants from defendant, did not discuss the terms of the Warrant Agreement with defendant, and presents no such separate and individualized "contract" for this court to reform. Plain-

the Complaint arguing that plaintiff is not entitled to the equitable relief of reformation because: (1) the Warrant Agreement contains no mistakes; (2) innocent third parties, defendant's other shareholders, will be harmed by the dilution of their stock; and (3) plaintiff has an adequate remedy at law by means of the other claims it raised in its complaint. (Def.'s Br. Supp. Mot. Summ. J. at 2–3.)

Plaintiff also seeks summary judgment and asserts that defendant's motion for summary judgment should be denied because: (1) it is not seeking to amend the Warrant Agreement, but rather the specific individual agreement between plaintiff and defendant created when plaintiff first purchased Warrants; (2) the value of defendant's stock will not be diluted because defendant no longer has any common stock after its merger with Forest Oil, alternatively, the court may award plaintiff money damages rather than stock; and (3) plaintiff's other claims offer only a partial remedy, reliance damages rather than expectancy damages. (Pl.'s Br. Opp. Mot. Summ. J. at 2–4.)

Plaintiff acknowledges that Delaware law governs the reformation issue. (Pl.'s Br. Opp. Mot. Summ. J. at 16–18.) Defendant also acknowledged that Delaware law applies, citing to Section 11 of the Warrant Agreement which provides that it is governed by Delaware law. (Def.'s Br. Supp. Mot. Summ. J. at 23 n. 12.)[4] This court concludes that the issue of reformation is governed by Delaware law.

## II. STANDARD OF REVIEW

◼ *Summary Judgment Standard.* Pursuant to Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Michaels v. New Jersey,* 222 F.3d 118, 121 (3d Cir.2000), *cert. denied,* 531 U.S. 1118, 121 S.Ct. 873, 148 L.Ed.2d 780 (2001). In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party, and all inferences must be drawn in that party's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court, however, must consider the evidence supporting reformation in light of the standard of proof plaintiff must meet to establish its right to that equitable remedy. *Cerberus Int'l, Ltd. v. Apollo Management, L.P.,* 794 A.2d 1141, 1149 (Del.2002) (adopting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.")). In the instant matter, the party seeking reformation bears a high burden of proof. "The agreement as executed must stand unless the party seeking reformation can, by clear and convincing proof, provide the court with a clear understanding of how the intended agreement conflicts with the formal writing." *Croxton v. Chen,* 1998 WL 515346, at *2 (Del.1998) (citing *Hob Tea Room v. Miller,* 89 A.2d 851, 857 (Del.1952)). *See also Cerberus,* 794 A.2d at 1149 (considering a defendant's

---

tiff's reconfiguration of its argument is not only too late, but devoid of any factual support.

**4.** Defendant explained that, out of an abundance of caution, it also cited Pennsylvania authority in recognition of the fact that plaintiff is a Pennsylvania partnership and, thus, supposing that Pennsylvania law could possibly apply. (Def.'s Br. Supp. Mot. Summ. J. at 23 n. 12.)

motion for summary judgment in an action for reformation of a merger agreement, the Delaware Supreme Court concluded that "the trial court must determine whether the plaintiffs on the summary judgment record proffered evidence from which any rational trier of fact could infer that plaintiffs have proven the elements of a prima facie case [for reformation] by clear and convincing evidence").

■ **Reformation.** Reformation is an equitable remedy that is "sparingly" granted. *H. Prang Trucking Co., Inc. v. Local Union No. 469,* 613 F.2d 1235, 1239 (3d Cir.1980). "Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement." *Id.* Under Delaware law, two doctrines allow reformation.

The first is the doctrine of mutual mistake. In such a case, the plaintiff must show that both parties were mistaken as to a material portion of the written agreement. The second is the doctrine of unilateral mistake. The party asserting this doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent. Regardless of which doctrine is used, the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement.

*Cerberus,* 794 A.2d at 1151–52 (footnotes omitted). *See also Emmert v. Prade,* 711 A.2d 1217, 1219 (Del.Ch.1997) (a document may be reformed to reflect the original intent of the parties but reformation is appropriate "only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence.") (citation omitted). "Reformation is not a man-

date to produce a reasonable result." *Collins v. Burke,* 418 A.2d 999, 1002 (Del. 1980). Rather, the principle of reformation is "based on intention." *Id.*

■ Reformation has also been allowed to those in privy with the original parties. "Reformation will be allowed not only as against the original parties, but also against those claiming under them in privity, such as representatives, heirs or designees, legatees, assignees, voluntary grantees, or judgment creditors, or purchasers from them with notice of the facts." *Phoenix Chair Co. v. Daniel,* 228 Ala. 579, 155 So. 363, 366 (1934). In *Emmert,* the executor of the estate of the decedent had standing to pursue, albeit unsuccessfully, a reformation claim to reform beneficiary designations of decedent's life insurance policy and pension plan to match the disposition of assets under decedent's will. *Emmert,* 711 A.2d at 1217–18. *See also L.E. Myers Co. v. Harbor Ins. Co.,* 67 Ill.App.3d 496, 24 Ill.Dec. 182, 384 N.E.2d 1340, 1345–46 (1978) (reformation of written instruments may be had by the immediate parties thereto and by those standing in privity with them, such as their successors; a person not a party or a privy to the transaction, even a person with a substantial interest therein, may not maintain the action), *aff'd,* 77 Ill.2d 4, 31 Ill.Dec. 823, 394 N.E.2d 1200 (1979).

■ The "mistake" requiring reformation, however, must have occurred between the original parties to the contract and existed at the time the contract is executed. *Collins v. Burke,* 418 A.2d 999 (Del. 1980) (reformation granted based on "mistake" in original deed); *Fitzgerald v. Cantor,* 1998 WL 781188 (Del.Ch. Oct.28, 1998) ("mistake" at issue in reformation claim was between parties to the original contract). Reformation is not intended to bring documents into conformity with an intention that arose after the original con-

tracts were executed. *Emmert,* 711 A.2d at 1219 (will may not be reformed where it accurately stated the intention of the parties at the time it was executed, even though decedent later expressed a contrary intent).

## III. DISCUSSION

### A. *The Evidence Upon Which Plaintiff Relied.*

Plaintiff asserts that its review of the following documents/information convinced it that each Warrant was convertible into forty-five shares of defendant's common stock: Bloomberg financial information database; defendant's bankruptcy plan and disclosure statement, and defendant's SEC Forms 8–K, 10–K and 10–Q. (Pl.'s Mem. of Law Supp. Summ. J. at 8–9.) A review of these documents does not support plaintiff's contentions. To the contrary, a review of these documents, along with the review of the Warrant Agreement attached to defendant's Form 8–K, Form 10–K and Debtors' Joint Plan Supplement, supports defendant's motion for summary judgment on the issue of reformation.

### 1. *Bloomberg Financial Information Database.*

Bloomberg described the Warrants as follows: "Purchasers of the Preferred Stock received warrants to purchase 45 shares of Common Stock for each share of Preferred Stock acquired." (Def.'s Br. Opp. Summ. J. at 11.) The Bloomberg information upon which plaintiff's claimed to have relied, belies plaintiff's position that it believed that only 40,000 Warrants were issued. The Bloomberg information contained a table showing the equity interests held by defendant's principal shareholders, Anschutz and Oaktree, as of April 17, 2000, *after* the issuance of the Warrants. The table reflected that Anschultz held 652,329 Warrants, and that Oaktree held 364,320 Warrants. *Id.* at 12 n. 6. The total Warrants held by these two shareholders was 1,016,-640. Moreover, this table reveals that the exchange rate of the Warrants was one share of common stock for one Warrant. Adding each shareholder's "New Common Stock" and the "Subscription Warrants," equaled the "Total New Common Stock" published in the table. *Id.* Exchanging each Warrant for forty-five shares of common stock, would increase the number of common stock shares well in excess of the totals described in the Bloomberg report.

### 2. *Debtors'*[5] *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("First Amended Plan").*

The First Amended Plan contains the following relevant definitions:

1.84 *Plan* means this Chapter 11 joint plan of reorganization, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time.

1.100 *Rights Offering* means the issuance to holders of certain Claims in or potentially within Class 8 of rights to purchase units consisting of Subscription Preferred Stock and Subscription Warrants pursuant to and in accordance with the terms of Article IX of the Plan.

1.116 *Subscription Rights* means the rights to purchase units consisting of Subscription Preferred Stock and Subscription Warrants pursuant to and in accordance with the terms of § 9.1 of the Plan, Exhibit 3 to the Plan.

1.121 *Subscription Warrants* means the warrants to purchase 7.5% of New Forcenergy Common Stock on a fully

---

5. The "Debtors" were defendant, Forcenergy, Inc., and Forcenergy Resources, Inc. (Pl.'s Affirms. and Affids. Supp. of Summ. J. (Rappaport Affirm. Ex. I)).

diluted basis to be issued pursuant to the Rights Offering on the terms and subject to the conditions set forth in § 9.1 of the Plan and the Subscription Warrant Agreement.

1.122 *Subscription Warrant Agreement* means the warrant agreement providing for the issuance of the Subscription Warrants, which Subscription Agreement shall be in substantially the form contained in the Plan Supplement. (Pl.'s Affirms. and Affids. Supp. of Summ. J. (Rappaport Affirm. Ex. I.) (hereinafter "Rappaport Affirm.") at 10–12.) Exhibit 3 attached to the First Amended Plan described the "Rights Offering" as being an "[o]ffering of rights to purchase units consisting of (i) one (1) share of Preferred Stock, and (ii) a warrant to purchase 45 shares of the New Forcenergy's Common Stock." (Rappaport Affirm. Ex. I at Ex. 3.)

3. *First Amended Joint Disclosure Statement ("Disclosure Statement").* The Disclosure Statement summarizes the Rights Offering by repeating the same language used in the First Amended Plan to describe the Rights Offering. (Rappaport Affirm. Ex. J at 59–60.) The Disclosure Statement also described how the Rights Offering fit into defendant's post-bankruptcy capital structure, specifically that defendant would issue 1.8 million Warrants exercisable to purchase 1.8 million shares of New Forcenergy's Common Stock.[6]

4. *Defendant's Form 8–K.* Defendant's Form 8–K, dated January 26, 2000, included as Exhibit 2.1 a copy of the First Amended Plan. (Rappaport Affirm. Ex. H at Ex. 2.1.) Defendant's 8–K also included as Exhibit 2.3 the Plan Supplement dated November 8, 1999, and as Exhibit 2.4 defendant's Motion to Substitute Revised Warrant Agreements. The Warrant Agreement was attached to the Motion. (Def.'s Suppl. App. Ex. 2.)[7] Plaintiff denies that it or its representatives ever saw or received a copy of the Debtor's Joint Plan Supplement or the Warrant Agreement. These documents, however, were attached to defendant's Form 8–K which plaintiff admits it reviewed. The Warrant Agreement and Debtor's Joint Plan Supplement, as described in greater detail, *supra,* clearly state that each Warrant may be converted into one share of common stock.

5. *Defendant's Form 10–K.* The Warrant Agreement and Warrant Certificate were attached to defendant's Form 10–K for the fiscal year ending December 31, 1999, filed on March 20, 2000. (Rappaport Affirm. Ex. E.) The Form 10–K contained the following statement:

> The Plan required the Company to raise $40 million in additional equity capital. This was to be accomplished through a rights offering to unsecured claimants to purchase units that include one share of ... Preferred Stock ... and a warrant

---

**6.** The chart on page 65 of the Disclosure Statement reveals that 1.8 million Subscription Warrants would be issued. The chart on page 67 of the Disclosure Statement explains that the "effect of the exercise" of the $10.00 Subscription Warrants will be 1.8 million "Dilutive Shares." It is clear the 1.8 million Warrants are convertible into 1.8 million shares of common stock. Page 68 of the Disclosure Statement states that "Subscription Warrants will be issued pursuant to the Rights Offering which will entitle the holders thereof to purchase an aggregate of 1,800,000

shares of New Forcenergy Common Stock." This language again confirms that the 1.8 million Warrants are convertible into an aggregate of 1.8 million shares of common stock. (Rappaport Affirm. Ex. J. at 65, 67, 68.)

**7.** The Form 8–K plaintiff submitted in support of its Motion for Summary Judgment was incomplete in that it failed to include these latter two exhibits, namely, the Plan Supplement and defendant's Motion to Substitute Warrant Agreements.

... to purchase 45 shares of New Common Stock.

*Id.* at 41.

6. **Defendant's Form 10–Q.** Defendant's Form 10–Q was for the quarterly period ended March 31, 2000, and filed May 15, 2000. (Rappaport's Affirm. Ex. D.) The relevant language in defendant's Form 10–Q is identical to that quoted above from defendant's Form 10–K. *Id.* at 5.

7. **Warrant Agreement.** The Warrant Agreement, in the form attached to defendant's Form 8–K, and as attached to the Form 10–K and the Plan Supplement, clearly stated in the preamble that defendant "agreed to issue to the Purchasers an aggregate 1,800,000 Warrants to purchase an aggregate of 1,800,000 Common Shares." (Warrant Agreement at 1.) The Warrant Agreement made clear that "each Purchaser is entitled to receive Warrants to purchase 45 Common Shares for each share of Series A Preferred Stock purchased." *Id.* The term "Warrants" was defined to "mean the 1,800,000 Warrants to purchase an aggregate of 1,800,000 Common Shares from the Company ...," and each Warrant shall represent the right to purchase one Common Share of the Company." *Id.* at 5. The Warrant Agreement explained that "[e]ach Warrant Certificate shall entitle the Holder thereof ..., to acquire from the Company, for each Warrant evidenced thereby, one Warrant Share at the Warrant Price." *Id.* at 7. Additionally, the Warrant Certificate, attached to the Warrant Agreement, likewise specified that each Warrant is convertible into one share of common stock.

8. **Debtors' Joint Plan Supplement.** An unexecuted copy of the Warrant Agreement was attached to the Debtors' Joint Plan Supplement (the "Plan Supplement"). While plaintiff contends that it did not review the Plan Supplement, the Plan Supplement was attached to defendant's Form 8–K, and referenced in the First Amended Plan, two documents plaintiff admits that it did review. This version of the Warrant Agreement stated that an aggregate of 1,800,000 Warrants would be issued to purchase an aggregate of 1,800,000 shares of common stock. (Def.'s Suppl. App. Ex. 2 at 1.) This version of the Warrant Agreement, consistent with the final version of the Warrant Agreement, also stated that "each Purchaser is entitled to receive Warrants to purchase 45 Common Shares for each share of Series A Preferred Stock purchased." *Id.*

**B. Defendant's Motion for Summary Judgment Must be Granted As Plaintiff is Not Entitled to Reformation of the Warrant Agreement.**

■ The above documents reveal that defendant, as part of its Chapter 11 bankruptcy plan of reorganization, offered to a certain group of creditors a "Unit" consisting of one share of defendant's preferred stock and a warrant or warrants to purchase forty-five shares of defendant's common stock for each share of preferred stock. Plaintiff's confusion appears to have arisen from the fact that defendant initially described a Unit as comprised of one share of preferred stock with a *warrant* (singular) to purchase forty-five shares of common stock. Apparently as the Rights Offering evolved, the Unit became comprised of one share of preferred stock with forty-five *warrants* (plural) to purchase one share of common stock each, for a total of forty-five shares. From the beginning, however, each Unit included one share of preferred stock and the right to purchase forty-five shares of common stock. Whether the right to purchase common stock was accomplished through one Warrant or forty-five Warrants, does not change the clearly stated offering: each share of preferred stock was accom-

panied by the right to purchase forty-five shares of common stock.

Plaintiff claims that both of its representatives, Wiener and Tattersall, confirmed that the Warrants were convertible into forty-five shares each in separate telephone calls to David Brenza, one of defendant's employees. (Pl.'s Mem. of Law Supp. Summ. J. at 13.) Mr. Brenza does not recall speaking with either Weiner or Tattersall. (Def.'s Br. Opp. Summ. J. at 21 (citing Brenza Dep. at 45–47).)

However, even assuming that Mr. Brenza misinformed Weiner and Tattersall of the exchange rate between the Warrants and shares of common stock, that fact would not support reformation of the Warrant Agreement. Reformation does not serve to correct an error that occurred after the fact. The parties admit that the Warrant Agreement contained no error, and this court finds that the documents upon which plaintiff relied consistently stated the terms regarding the Rights Offering. This is not a situation where plaintiff, as a successor, is seeking to correct the original party's error. Rather, plaintiff wants to remedy what it alleges was a misrepresentation made by defendant after the fact. In such a situation, reformation is not available.

Applying the law to this case, plaintiff could only reform the Warrant Agreement if the Warrant Agreement incorrectly stated the Warrant to share ratio agreed to the defendant and the other party to the Warrant Agreement, the Warrant Agent. *See Catamaran Acquisition Corp. v. Spherion Corp.*, 2001 WL 755387, at *5 (Del. May 31, 2001) (when reforming a contract, "the court amends or rewrites the instrument in accordance with its interpretation of the parties' expectations at the time the contract was made"). Plaintiff has no right to reformation where, as here, the Warrant Agreement accurately reflected the intent and understanding of the original parties,[8] and the only alleged mistake or fraud occurred after the Warrant Agreement was executed. A careful and deliberate review of the materials available to plaintiff before it purchased the Warrants, would have informed plaintiff that the deal it envisioned was simply too good to be true.

For the above reasons, defendant's motion for partial summary judgment is granted, and plaintiff's motion for summary judgment is denied. An appropriate order follows:

### *ORDER*

AND NOW, this day of November, 2002, upon consideration of defendant's motion for partial summary judgment (Document No. 30), and plaintiff's motion for summary judgment (Document No. 31), and for the reasons stated in the accompanying Memorandum of Decision, it is hereby

### ORDERED

1.  Defendant's motion for partial summary judgment (Document No. 30) is **GRANTED**; and

2.  Plaintiff's motion for summary judgment (Document No. 31) is **DENIED**.

---

8.  There is no dispute that the Warrant Agreement accurately reflects the intent and understanding between defendant and the Warrant Agent. *See* Def.'s Br. Opp. Summ. J. at 29– 30; Def.'s Br. Supp. Summ. J. at 10–12 (both citing the deposition testimony of Herbert J. Lemmer, Esquire, the senior vice-president of the Warrant Agent).